On Motion to Dismiss the Appeal.
NICHOLLS, C. J.
The state moves to dismiss this appeal on the ground that the transcript of appeal was filed too late. Appellant appealing from a judgment in a criminal case is entitled to three judicial days beyond the return day within which to file his transcript. The return day in this case was the last day upon which this court was in session prior to its adjournment for the annual vacation. The filing by the appellant of his transcript during the vacation was in due time. The facts of the ease do not justify the dismissal, of the appeal. The motion is refused. State v. Estoup, 39 La. Ann. 906, 3 South. 124.
Statement of the Case.
Steve Gosey, Richard Blunt, Bud Jackson, and Ovide Benoist were indicted by the grand jury of the parish of Natchitoches for murder. Bud Jackson and Ovide Benoist were tried, and, having been found guilty without capital punishment, were sentenced to life imprisonment in the penitentiary. Erom this verdict and sentence they have appealed.
When this case was called for trial in the district court on the- 12th of June, 1903, the junior counsel of Benoist filed- a motion for its postponement, sworn to as to its facts by Benoist himself, which was overruled by the court, and a bill of exception was reserved to the action of the court.
In this motion he averred: That he had employed the firm of Breazeale & Breazeale, attorneys at law, as his counsel. That Phanor Breazeale, the senior member of the firm, was then absent unavoidably in the city of New Orleans, where he had gone on Tuesday, the 11th of June, to be present in the Supreme Court on the next day to argue a very important case before that court, intending fully to return and be present at the trial of his case; but, owing to the fact that its docket was congested, the Supreme Court continued the case from day to day, and finally set it down for argument for the 12th of June (the day his own case in Natchitoches parish was called for trial). That in consequence of this he was compelled to remain in New Orleans, and was therefore unable to be present before the court to represent him. That he attached to his motion a telegram from him to his brother, the junior member of the firm, which explained the fact. That Phanor Breazeale had had special charge of his case since his arrest, and he was the only one with whom he had discussed it. That he had represented him in the preliminary examination, and therefore had full knowledge of the facts. That he was the only one in position to defend him. That he was on trial for his life, and was entitled- to be represented by an attorney, and that he had done all in his power to obtain one, and did employ one, but, owing to the circumstances, he was unable to be present, as above set forth. That Mr. D. W. Breazeale, the junior member of the firm of Breazeale & Breazeale, was present in court, but did not consider himself sufficiently informed of the facts involved in the case to represent him, and that it would work a hardship on him, *619 as well as on Mr. D. W. Breazeale, the junior member of the firm, to force him into a trial at that hour.
That Mr. Phanor Breazeale, as would be seen by the telegram attached, would be present the next morning, and prepared to represent him, if he was allowed a continuance until then. Mr. Phanor Breazeale would not have gone to New Orleans if it had not been for the fact that the district attorney had assured him (Mr. Breazeale) that the case would be postponed until Saturday if he (Mr. Breazeale) could not return before then. That it was impossible for Mr. -Breazeale to be present, and, under the promise of the district attorney, he was justly .entitled to a postponement. That, under the conditions, it would be unjust and unfair to force him into a trial. That, under the Constitution and laws of the state of Louisiana he was entitled to be represented by a licensed attorney on this trial, and that, if he was then forced into a trial, he would be deprived of that right, which was a violation of the Constitution. That two of his witnesses, Mr. G. W. Kile and Mr. J. R. Voiers, were both absent, and that he could not go to trial without them. That the said Mr. .J. R. Voiers was an important witness in his behalf, and that he had used every effort and due diligence to procure their attendance, but, through no fault of his, the said Voiers was absent. That Voiers was duly summoned by his attorneys, but, for some unknown reason, he was never sworn. That, if the said Voiers were present, he would absolutely and positively swear that he saw a hand car returning from Cypress on the ■-- day of-. 1903, about-o’clock on said morning of said day, and that there were only three persons on said car; that he saw the said car on the said day at said time, with three persons only on it at said time, coming towards the depot at Natchitoches, at a point on the said railroad about-yards from the depot, and about-yards from the oilmill; that he saw no one else about or around said point where he saw the hand ear. He would further swear that the said hand car was propelled by three persons only, and was going at a speed of - miles an hour, and that it would have been impossible for any one to have jumped off without his seeing him. That, if the said-G. W. Kile was present, he would swear that he had known affiant for a good many years, and had always known him to be a good, honest, hardworking colored man, who had never even been accused of any crime since he had known him.
That, under all the facts and circumstances above set forth, he was not ready to go to trial, and that he was justly entitled to a postponement until the next day, until his attorney could reach the court. That, if he was then forced into a trial, it would be a hardship on him, and would be taking an undue advantage of him, and depriving him of his sacred rights under the Constitution, to wit, that of the presence of an attorney to represent him, and the attendance of witnesses. That he was entitled to a postponement of his trial, and respectfully prayed the court to grant him one until the next day.
The District Judge assigned as the reason for his ruling that “the grand jury had been called two weeks in advance of the petit jury, so that the cases of parties indicted could be fixed before the petit jury met. The indictment in the case was returned on Monday, June 1st. At that time Mr. Phanor Breazeale was absent in New Orleans, and the junior member of his firm asked the court to postpone the arraignment of the accused until the following day, when Mr. Breazeale would be present. The request was granted, and on the next day, Mr. Breazeale being present, the accused were arraigned, and the case was fixed- by consent of parties for Friday, June 12th. After the day was fixed, Mr. Breazeale stated that he would go to New Orleans on Thursday, June 11th, to argue a case before the Supreme Court which was fixed for that day, and tiat, as the docket of the Supreme Court was crowded, his case might not be reached until Friday. I then stated to him in open court that as there were a large number of cases fixed for Saturday, 13th, and as there would- be no jury for the following week, I would not entertain an applicátion for a continuance of the present case on the ground of his absence, and he replied that he thought he would be able to return from New Orleans in time. When the application was made there were cases fixed for the following day, and a great number for Monday, loth, most of them misdemeanors, with perhaps one hundred witness *621 es who had been summoned, and who would be present. I was extremely anxious to save the parish the heavy expense of having these cases continued. As I knew the principal facts in the case, having held a preliminary examination of one of the accused, I hoped and believed that the case could be finished by twelve o’clock that night, which would have enabled us to dispose of the cases fixed for the following day. As a matter of fact, the case consumed the better part of four and one-half days, but above and beyond these reasons for refusing the postponement was the conviction that the accused parties would not suffer any substantial injury. They were jointly indicted and tried, and made a common defense. At the time the application was made there were present three competent and experienced attorneys representing them, viz., Mr. D. W. Breazeale, Mr. O. M. Cunningham, and N. T. Smith.
“As to the agreement between Mr. Phanor Breazeale and the district attorney, set out in the application, the district attorney informed me in open court that he had made no such promise. It is a rule of this court that agreements between counsel, made out of the presence of the court, and not reduced to writing, will not, in the event of misunderstanding, be enforced. The absent witnesses named in the application were, to my personal knowledge, but a short distance from the courthouse at the time, engaged on a public road, and I knew their attendance could be obtained. In fact, they came into the courtroom shortly afterwards, or about the time the application was passed on, and remained in attendance until the close of the trial. Mr. Kile was placed on the stand by one of the defendants, but Mr. Voiers was not.”
Upon the overruling of the motion the case was opened, and seven jurors were selected, and sworn, among them one F. T. Latier.
The minutes stated that at that point, the venire and the talesmen summoned from the bystanders having been exhausted, the court ordered the sheriff to summon 30 talesmen from the country, to report the next morning at 11 o’clock, and then adjourned.
The court met the next morning, and by consent of all parties F. T. Latier was excused from the jury.
Ihe jurors ordered to be present were called, and all answered. Phanor Breazeale, then present, presented a motion, signed and sworn to by Benoist, to annul all former proceedings in the case and begin anew, which was overruled by the court, and a bill of exception was reserved.
In this motion, after reciting the facts recited in the motion for a postponement, the mover averred that he was entitled to the presence of his leading counsel when the case was called for trial on Friday, and have him select the jury to try him; that, notwithstanding his earnest protest, the drawing of the jury to try him commenced by order of the court, and seven jurors were selected, all without the benefit, advice, examination, and approval of his leading counsel, and he was forced to trial; that, in addition to this, the district attorney had promised his said counsel to postpone his case, until Saturday in the event the said Phanor Breazeale could not try his case in the Supreme Court in time to be present on the Friday morning when the case was fixed for trial; that his leading counsel telegraphed from the city of New Orleans on Thursday to the district attorney and the district judge that he was compelled to remain in New Orleans to try the case in the Supreme Court, and could not be in Natchitoches before Saturday morning; that notwithstanding all these facts the court, upon motion of his leading counsel that morning to discharge the jury, and to recommence the case, in order to give petitioner the benefit of the services of his leading counsel, refused such petition, and ruled the petitioner to continue the trial, all of which was unjust, contrary to law, and worked petitioner irreparable injury. He prayed that the trial be discontinued and recommenced, in order that his leading counsel might participate in the selection of a jury, and for the purpose of challenging the validity of the indictment, and of the validity of drawing, summoning, and impaneling the jury.
This motion was overruled, the judge stating that he overruled the same for the reasons given by him for the refusal of the motion for postponement; that it was impossi *623 ble to discharge the seven jurors already selected, and begin over again, because the panel had been exhausted, and the jurors discharged for good.
On the trial, when Henry Bryan, a witness for the state, who had testified that he was the stepfather of the deceased, Nelson, was under cross-examination, he was asked whether he knew whether the deceased was a fugitive from justice when he was killed; whether he was indicted for a crime, and whether he had recently broken jail; whether or not he was accused of having murdered a man in Sabine parish, and was running from the officers.
These questions were objected to by the district attorney on the ground that they were irrelevant, and .these objections were sustained by the court as being irrelevant to any of the issues propounded in the case at the stage they were raised. The court said counsel did not inform it of any special reasons which would take it out of the general rules applicable to such cases. There was no attempt made to reduce the killing from murder to manslaughter by showing that the accused were attempting to arrest the deceased, whom they honestly believed to be a felon fleeing from justice. The defense was that the accused did not kill the deceased. In fact, counsel admitted in the argument that the killing was “a dastardly murder,” for which the perpetrators deserved the extreme penalty of the law.
On the trial of the case, Richard Blunt being called as a witness for the defendants then on trial, Blunt’s counsel (Mr. Henry) objected, and asked permission, of the court to take the witness off the stand, to talk privately with him. The court granted the permission, and counsel of defendants excepted. In the bill of exception he states that the witness was jointly indicted with the two defendants then on trial, but he was not on trial, for the reason, which counsel assumed, but did not then know, that the district attorney might, if the exigencies of the case required it, use him as a witness. Counsel subsequently became aware of the fact that the district attorney had used him as a witness before the grand jury in order to secure the indictment of the other forties.
The court stated that Blunt’s counsel wished to talk privately with him, to determine whether or not to permit him to testify. The court thought the request reasonable.
It is recited in the third bill of exception that the counsel of Blunt having been permitted, over the exception of defendant’s counsel, to confer privately with him, he, after such conference, withdrew in open court his objection to his testifying. Whereupon Benoist’s counsel asked witness if he had any connection with the case then on trial; that, on witness replying, “Partly so,” counsel told him, “Tell all you know about the case. Tell the truth.”
Witness then began a narrative as to the case, and had proceeded for some time, when Benoist’s counsel requested permission of the court to interview the witness privately. Blunt’s counsel objected, and the court sustained the objection, stating that he could interview him in the presence of his counsel. Blunt and his counsel and Benoist’s counsel then withdrew to an anteroom, and, after a consultation, returned into court. Blunt took the stand again, when his counsel renewed his objection to his testifying. The court overruled the objection, with the statement that, after full consultation and deliberation, Blunt’s counsel had declared his willingness for the witness to testify to all he knew about the case, and it would not countenance any further delay, or permit parties to blow hot and cold in this manner. That, thereupon Mr. Breazeale requested permission, or renewed his request to be permitted, to interview the witness alone. Blunt’s counsel objected again, as he had before, and the court sustained the objection. Thereupon Mr. Breazeale consigned the witness to the state for cross-examination. The bill of exception recites that, up to the time that the witness Blunt was interrupted in his testimony, he had brought the matter down to Thursday evening; the killing having occurred, as alleged in the indictment some time after midnight the following Saturday morning, and in his testimony he had not mentioned the name of either prisoner, except Bud Jackson.
At this point the district attorney asked the witness the following question: “Richard, you stated that you had some connection with this case?”' to which he answered, *625 “Yes, sir.” The next question propounded was, “Who was connected with you in the case?” Thereupon counsel for Benoist objected on the ground that the witness had not been examined as to Ovide Benoist’s connection with it; that his name was not mentioned in the testimony, and that he was interrogated about matters happening 36 hours preceding the homicide, and of a conversation with Bud Jackson touching the receipt of a telegram about his (Bud Jackson’s) nephew having been killed a day or two before; and that the district attorney could not interrogate the witness or cross-examine him on any matter or subject not brought out by him in examination in chief. The court overruled the objection, holding that the witness had been placed on the stand by counsel for Benoist, and as Blunt’s counsel had stated that he was there to tell all he knew about the case, and as Benoist’s counsel asked him to tell all he knew about the case, and he had proceeded to do so when he was interrupted and consigned to the state for cross-examination, the rule invoked by counsel for Benoist was not applicable.
In the addendum to this bill the court said:
“In order that the ruling complained of in this bill may be fully understood, a statement of the facts of the testimony disclosed by the witness is deemed necessary.
“The homicide occurred at Cypress, a station on the T. & P. By. about 11 miles from Natchitoches,, about three o’clock in the morning of April 4, 1903. It seems that the deceased and his companion, Frog Saddler by name, had been working on the railroad at Beisor, and had come into Natchitoches the day before, where they, had remained all day, returning to ' Cypress that evening on the train. As stated above, one of the men (Nelson) was killed by shotgun wound in the back, and his companion, Saddler, was at the time seriously wounded. On the day of the shooting, three of the parties under indictment, viz., Bichard Blunt, Bud Jackson, and Ovide Benoist, were arrested at this place under a charge of murder. Gosey escaped, and has not been captured. The district attorney did not put Blunt on trial, for reasons stated in another bill. When Blunt was placed on the stand by counsel for defendants, the state had closed its case, which was substantially as follows: Mr. Fletcher, division section foreman of the T. & P. Railroad at this place, testified that about 12 o’clock on the night of the homicide the four accused, Benoist, Jackson, Blunt, and Gosey, came to his house, woke him up, and asked him to loan them a hand car, saying they wanted to go to Cypress to arrest two negroes whom they supposed had killed a negro, Joe Quinn, at Zwolle, La., a station of the P. G. Boad, several days previously. Quinn was a Natchitoches negro, and a cousin of Jackson and Gosey. Fletcher refused their request, and told them to go to Brown, the foreman of this section, and ask him for a car. They 'left him, and the next morning, about 5 o’clock, Benoist, one of the accused, came to his house and asked him not to tell any one about their visit to him the night before, or their efforts to borrow a hand car. Fletcher then asked Benoist how they came out, and the latter replied that there were two dead negroes down there; that, when they went on them, one of them said his name was Holmes, and about that time he died. Vined, the night watchman at the depot, swore that about 12 o’clock on the night in question four men passed him on a hand car, going in the direction of Cypress; that the locomotive upon which he was at the time was partly on the switch, but not clear of the main line, and that the parties asked him to move the engine so that they could pass; that he recognized Blunt, Jackson, and Gosey, but that the fourth man had his back turned and that he could not see who he was. Frog Saddler swore that he and his deceased companion slept in a box car at Cypress on the night of the killing until about three o’clock, when a freight train came in, and they left the car where they were sleeping and started down the track. When they reached a point near the eastern end of the depot, two men halted them, and almost immediately fired upon them, and that he and his companion fell, and their assailants fired on them again. He positively' identified Ovide Benoist and Bud Jackson as the men who did the shooting. This was, in a condensed form, substantially the state’s case when the district attorney closed. Counsel for Benoist had asked the last-named witness (Frog Saddler) if he did not, while lying wounded in the waiting room at the depot, *627 tell Mr. Rachel, the night operator, that he •clicL not know who did the shooting, but that it was done by two men, one of whom wore a blue jumper, and the other a white hat. The witness denied making this statement, but Rachel subsequently swore that he did make it. Counsel for defendants then opened the case by placing Blunt (who was indicted with Benoist and Jackson, but who was not on trial, as before stated, and whose case had been since dismissed by the district attorney) on the stand, and asked him what kind of a hat he owned. The witness, holding out a light colored or white hat, said, ‘This is my hat.’ I-Ie was asked how long he had owned it, and stated that he bought it last February. He was asked if he was wearing that hat on the night John Nelson was killed, and he replied that he was. Then followed the questions, answers, and other proceedings recited in the first' part of this bill, and the consignment of the witness to the district attorney for cross-examination, with the last question propounded to him by the counsel for the accused uncompleted by him, and not withdrawn by the counsel for the accused, who asked it. In answer to questions propounded by the district attorney, and objected to by counsel for defendants, as heretofore detailed, the witness then continued his narrative by telling how the other accused parties had insisted upon his going with them to Cypress the night of the killing to assist in propelling the hand car; how they first told him that their purpose was simply to arrest the two men who were suspected of having killed Joe Quinn; how, after they had drunk freely of some whisky which they carried along, they declared that they would kill the men; how they stopped the hand car a short distance above Cypress, and walked down to the place while he remained at the car; how he heard shots afterwards in the direction of the depot; how the three accused, Jackson, Benoist, and Gosey, shortly thereafter came running back, when they all returned to Natchitoches on the hand car, the accused telling him on the way back that they had killed the two men. In view of the fact that this witness had testified on direct examination that on the night in question he wore a white hat; that counsel for the accused had clearly manifested his intention to show by the night operator that the prosecuting witness Saddler had stated shortly after the shooting that one of the assailants of himself and the deceased man wore a white hat, which statement the operator subsequently swore was made to him—it is submitted that all of Blunt’s testimony W'as necessary to explain his evidence in chief relative to the hat, and to repel the presumption that he, and not the accused, did the shooting, and that all of the testimony was clearly connected with that brought out or inquired about in his direct examination. Thompson on Trials, vol. 1, p. 385; Ency. Pleading & Practice, vol. 8, p. 7; and Louisiana authorities there cited.”
The fourth bill of exception recites that Richard Blunt was called to the stand by counsel for defendants, as shown by bill of exception No. -, and, on the witness returning into court with his counsel, counsel for witness withdrew his objection, whereupon witness was asked, “What did your counsel tell you when he took you off the stand for four or five minutes’ consultation, and came back and told you to go and testify?” The district attorney objected on the ground that the purpose of the testimony was to impeach counsel’s own witness; and counsel for the witness, Mr. Henry, objected on the ground that whatever he may have said to his counsel in a consultation is privileged, under the Constitution and laws of this state. The court sustained the objection of witness’ counsel for the following reasons: The witness was a boy 18 or 19 years of age, under indictment for the same crime for which the accused were being tried. Before his counsel would consent for him to testify, he asked permission from the court to talk privately with his client. It was this consultation between attorney and client which was inquired about, and which the court refused to compel the witness Blunt to disclose.
The fifth bill recites that, on the trial, counsel for Benoist requested permission from the court to take the witness Richard Blunt off the stand to have a private consultation with him for 10 minutes; counsel stating to the court that he had never talked to him before. Counsel for witness Richard Blunt objected. This objection was sustained by the court; the court stating to the counsel for *629 defendant Ovide Benoist that he might consult the witness in the presence of Mr. Henry, counsel for witness Bichard Blunt.
The witness Bichard Blunt was under indictment for murder with the defendants. Me is as colored hoy, and the evident purpose of counsel for Benoist and Jackson was to show that he (Blunt) was the guilty party. Under these circumstances, the court deemed it improper to permit the counsel for Benoist and Jackson to privately interrogate the witness out of the presence of his counsel.
The sixth bill of exception recites that the witness Bichard Blunt, being on the stand, was asked: “When you got to Cypress, you were satisfied that Gosey had told the truth? (Objected to by the district attorney. Objection sustained by the court. The witness had testified to a statement made to him by Steve Gosey, one of the parties charged with this crime, but not in custody or not on trial, which was objected to by the district attorney, and which objection was sustained by the court.)
“Q. What were your feelings in reference to this outrage, and your acquiescence in it, when you saw this murdered man had been so heinously murdered. (Objected to by the counsel for the state. Objection sustained by the court.)
“Q. Why did you not go immediately to the law officers—Judge Porter, he was in town—and tell him everything about it? (Objected to by the district attorney on the ground that the purpose of this testimony is to discredit his own witness. Objection sustained by the court. Bill reserved.)
“Q. Why did you wait to tell it until after you were indicted, and then not tried with your eodefendants? (Objected to by the district attorney for the same reason given above. Objection sustained by the court, and bill reserved.)
“Q. Have you been promised any inducement of a moneyed consideration, or immunity from punishment, if you were to testify for the state in this case against these two defendants? (Objected to by the counsel for the state on the ground that he is trying to discredit his own witness. Objection sustained by the court, and bill reserved.)
“Q. Were you notified that you were going to be used as a witness by the state in the trial of this case? (Objected to by the district attorney for reasons already given. Objection sustained by the court. Bill reserved.)”
This witness had been placed on the stand by counsel for Benoist and Jackson. The obvious purpose of the question was to impeach or discredit his own witness. The court held that he could not do so.